RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LEONARD FOSTER, as administrator of the Estate of his deceased daughter Armetta L. Foster, and as a representative of her next of kin, her children K.W. and D.W., Jr.,

              *Plaintiff-Appellee,*

*v.*

DUSTIN PATRICK, individually,

              *Defendant-Appellant.*

No. 14-6254

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 1:12-cv-00179—Harry S. Mattice, Jr., District Judge.

Argued: October 6, 2015

Decided and Filed: November 20, 2015

Before: SILER, CLAY, and GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Haley E. Moody, LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC, Chattanooga, Tennessee, for Appellant. Whitney Durand, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** D. Scott Bennett, Mary C. DeCamp, LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC, Chattanooga, Tennessee, for Appellant. Whitney Durand, Chattanooga, Tennessee, John M. Wolfe, Jr., Chattanooga, Tennessee, for Appellee.

_____

**OPINION**

_____

SILER, Circuit Judge.  Deputy Sheriff Dustin Patrick appeals the district court's denial of his motion for summary judgment based on qualified immunity in this civil rights case brought by Leonard Foster, the administrator of the Estate of Armetta L. Foster and the representative of Armetta's children.  For the reasons stated below, we **AFFIRM** the decision of the district court.

**FACTUAL AND PROCEDURAL BACKGROUND**

In May 2011, Deputy Patrick of the Bradley County Sheriff's Office saw Armetta Foster on Interstate Highway 75 (I-75) in Bradley County, Tennessee.  Foster was walking in the median of I-75 with her two children—her son, D.W., who was six years old at the time, and her daughter, K.W., who was ten.  After ensuring that Foster did not have any outstanding warrants, Patrick exited his vehicle with the engine still running and asked Foster what she was doing on the highway.  Foster told him that the car she was driving had broken down and that someone was coming to get her and her children.  Patrick told Foster she could not remain on the highway, but Foster insisted that she was going to continue walking on the road.  Patrick threatened to write Foster a citation, but Foster still was not persuaded.

Foster spoke with someone on her cell phone, and Patrick overheard part of the conversation, which led him to believe that Foster's ride "was probably 20 or 30 miles" from where they were.  Finally, Patrick told Foster that he was going to give them a ride, and if she did not comply, she was "going to . . . jail" and he would "have to call DCS to come pick [her] children up."  The parties disagree about what occurred next.  Three different accounts of the events were provided by Patrick, D.W., and K.W.

According to Patrick, he opened the driver's side door of his cruiser so that he could unlock the back door and persuade Foster to come with him.  As he turned back around, Foster had "bladed" toward him and was staring at him.  "Blade is a technical term when [a person] go[es] from standing straight on to standing to the side."  As Patrick reached slowly for his gun, Foster came toward him with a knife, making an overhead stabbing motion as she approached.

Patrick ran toward the front of the car and drew his weapon. Foster "had given up coming toward[]" Patrick and instead entered the driver's side of the police cruiser. Foster yelled for the children to get into the car, and Patrick ordered them to get back. Patrick commanded Foster to get out of the car "two to three times." Foster started to pull the shifter down, and Patrick fired his weapon four to five times. Patrick paused "to evaluate the situation." He again yelled for Foster to get out of the vehicle. She did not comply but instead, finished putting the car into drive and "gassed it." As she did so, Patrick resumed firing, "saw blood land on [his] uniform," and noticed Foster flinch once. Then, when Foster began to pull on to the interstate, Patrick fired "four or five more rounds." Foster drove down I-75, and Patrick holstered his weapon. Patrick was upset because he felt that he "didn't have control of that situation" and had let Foster leave in a "marked unit, with two weapons in there."

According to D.W., Foster carried a knife in her back pocket, but he never saw her pull out the knife during the encounter with Patrick. However, D.W. remarked that Patrick thought Foster "was going to cut him" because that was "the position that she gets in when she's really mad." D.W. further testified that Foster jumped on Patrick's back "[l]ike a piggyback ride." Patrick then "moved his shoulder to make" Foster fall off his back. According to D.W., Patrick began firing "after [Foster] was going to put [the car] in [the] drive motion."

K.W. never saw Foster with a knife, but she saw Foster jump on Patrick's back. To K.W., it looked like Foster "was trying to get [Patrick] on the ground or something." Patrick then threw Foster off his back and "started shooting." According to K.W., Patrick shot Foster as she was running toward the police car. Foster then drove off as Patrick continued to fire.

After Foster drove off in the police car, she continued on I-75 for a short distance before veering off the interstate into a fence and died later at a hospital. Patrick fired either thirteen or fourteen shots in total, eight of which made contact with Foster. Foster's autopsy report listed multiple gunshot wounds as her cause of death.

Leonard Foster (Leonard), Foster's father, filed suit on behalf of Foster and her minor children. Relevant to this appeal, Leonard alleged that Patrick infringed Foster's Fourth and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983 by using excessive force. The district court denied Patrick's motion for summary judgment, concluding that factual disputes

precluded an award of qualified immunity.  Patrick filed this interlocutory appeal challenging the denial of qualified immunity.

## STANDARD OF REVIEW

We review the district court's denial of Patrick's motion for summary judgment based on qualified immunity de novo.  *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 478 (6th Cir. 2014).  Leonard bears the burden of demonstrating that Patrick is not entitled to qualified immunity.  *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).  However, "we 'view the facts and any inferences reasonably drawn from them in the light most favorable to'" Leonard.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (quoting *Griffith v. Coburn*, 473 F.3d 650, 655 (6th Cir. 2007)).

## ANALYSIS

Qualified immunity shields public officials from liability for civil damages unless a plaintiff is able to establish:  (1) the facts show a violation of a constitutional right, and (2) the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated" the plaintiff's constitutional right.  *Martin*, 712 F.3d at 957 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  A plaintiff must establish both elements to proceed onward to the fact-finding stage, but the court may address the steps in either order.  *See Pearson*, 555 U.S. at 236.  Here, the district court properly denied Patrick's motion for summary judgment based on his qualified immunity defense.

### 1.  Constitutional Violation

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. . . . Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.

*Id.* at 11.  An officer may use deadly force "if the suspect threatens the officer with a weapon or there is probable cause to believe that [s]he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Id.* at 11.

We focus on the following factors to determine whether there is probable cause to believe that the suspect poses an imminent threat of serious physical harm:  "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007).  The ultimate question is whether Patrick had an objectively reasonable belief that Foster posed an imminent threat of serious physical harm to him or others when he shot Foster.  *See id.* at 890.  If the answer is no, then the use of deadly force violated Foster's Fourth Amendment right.  *See id.*

According to Leonard, Foster had assaulted a police officer without using a weapon; the struggle between Patrick and Foster had terminated; and Foster was fleeing at the time Patrick shot her.  "[W]hile such action by a suspect justifies force, it does not justify *deadly force*, especially when the struggle has concluded and the suspect is in flight."  *Id.* at 891.  The facts viewed in the light most favorable to Leonard demonstrate that Patrick may have shot Foster before she stole the police cruiser.  However, even assuming Foster committed a second crime by stealing the cruiser before she was shot, this action alone does not justify Patrick's use of deadly force.  *See Smith v. Cupp*, 430 F.3d 766, 773 (6th Cir. 2005) ("Although there was some danger to the public from [the suspect's] driving off in a stolen police car, the danger presented by [the suspect] was not so grave as to justify the use of deadly force.").

Even without the benefit of hindsight, a jury could reasonably conclude that neither Patrick nor anyone else was in danger when he shot thirteen or fourteen rounds at Foster—eight of which actually struck Foster.  *See Untalan v. City of Lorain*, 430 F.3d 312, 314–15 (6th Cir. 2005) (emphasizing the importance of courts not passing judgment with 20/20 hindsight).  Although a vehicle can be a dangerous weapon, *see Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992), the evidence would support a jury finding that Patrick and Foster's children were never in the line of danger of the police cruiser, *see Cupp*, 430 F.3d at 775 ("[T]he officer must have reason to believe that the car presents an imminent danger.").  The evidence also supports a

finding that Patrick continued firing after Foster was driving away and no one was in the cruiser's path. "An officer may . . . continue to fire at a fleeing vehicle even when no one is in the vehicle's direct path when 'the officer's prior interactions with the driver suggest that the driver will continue to endanger others with [the] car.'" *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014) (quoting *Hermiz v. City of Southfield*, 484 F. App'x 13, 16 (6th Cir. 2012)). But, in the light most favorable to Leonard, nothing suggested that Foster would endanger others with the cruiser. Although Foster was fleeing and the events were rapidly unfolding, Leonard has put forth evidence that Foster—who, to Patrick's knowledge, was unarmed and intent on flight—was not a threat to anyone when she fled in the cruiser.

Though Patrick relies on *Scott v. Harris*, 550 U.S. 372 (2007), to support his position, this was not a "dangerous high-speed car chase" as was the case in *Scott*. *See id.* at 379–80, 386. He also cites W*illiams v. City of Grosse Pointe Park*, 496 F.3d 482 (6th Cir. 2007). In *Williams*, an officer blocked the front of the suspect's parked car with the officer's police cruiser. *Id.* at 484. The suspect reversed his car and hit another police cruiser parked behind him. *Id.* The officer then exited his cruiser, ran toward the suspect in the car, and brandished his weapon. *Id.* The officer stuck his gun in the suspect's driver's side window. *Id.* The suspect then accelerated, attempting to navigate around the officer's cruiser and drove onto the sidewalk. *Id.* The officer, still holding onto the suspect's car, was knocked down and fired several rounds at the car. *Id.* We concluded that the officer's use of force was reasonable under the circumstances. *Id.* at 486. But in this case, Foster never used the police cruiser as a weapon. She never accelerated toward Patrick or anyone else.

Indeed, the facts viewed in the light most favorable to Leonard are more akin to *Cupp*, in which this court affirmed the district court's denial of qualified immunity. 430 F.3d at 768. In *Cupp*, an officer arrested a suspect for making harassing phone calls. *Id.* at 769. Although the suspect was impaired, he was fairly cooperative when he was handcuffed and placed in the backseat of the cruiser. *Id.* While the officer was talking to other people in the parking lot, the suspect climbed into the front seat of the police cruiser and began to drive away. *Id.* Viewing the facts in the light most favorable to the suspect, the officer shot the suspect either while the police cruiser was passing the officer or after the cruiser was driving away. *Id.* at 769–70. We

held that, even though there was some danger from the impaired suspect fleeing in a police car, "there was no immediate danger to anyone in the vicinity" as to justify the use of deadly force. *Id.* at 773. The thrust of the decision rested on the fact that the "evidence would support a jury finding that [the officer] was never in the line of flight." *Id.* at 774; *see also Godawa v. Byrd*, 798 F.3d 457, 465 (6th Cir. 2015) ("Of particular concern to us in *Cupp* was the fact that, under the plaintiffs' version of events, neither the officer nor any bystanders were in danger at the time that the officer shot [the suspect]."). Moreover, there was no evidence of other bystanders who were in the suspect's line of flight. *Cupp*, 430 F.3d at 774. The same is true here. Even assuming that Foster assaulted Patrick, Foster had ceased that conduct and was attempting to flee when Patrick shot her. No one was in Foster's line of flight when she fled in the police cruiser.

Finally, Patrick argues that Foster had access to two deadly weapons inside the police cruiser: a loaded shotgun above the driver's seat and a loaded rifle in the trunk. But nothing from the facts suggests that Foster knew about the weapons in the police cruiser or attempted to gain access to either of them. Furthermore, this court has previously acknowledged the danger presented when a suspect "driv[es] off in a stolen police car," but has concluded that such danger, without more, is "not so grave as to justify the use of deadly force." *Cupp*, 430 F.3d at 773. Moreover, "the officer must have reason to believe that the car presents an imminent danger." *Id.* at 775. Here, viewing the facts in the light most favorable to Leonard, Patrick did not have reason to believe that Foster would use the police cruiser or the weapons in compartments inside the cruiser to injure anyone.

## 2. Clearly Established Right

Although it is true that the right must be clearly established in a "'particularized' sense," *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)), several cases on point render the right at issue clearly established. First, "[i]t is clearly established constitutional law that an officer cannot shoot a non-dangerous fleeing felon . . . ." *Cupp*, 430 F.3d at 775–76. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 776 (quoting *Garner*, 471 U.S. at 11). Moreover, the flight of a felon in a police cruiser, without more, does not justify the use of deadly force. *See id.* at 773.

Finally, a struggle with a police officer *prior* to flight is insufficient to warrant the use of deadly force during flight. *See Bouggess*, 482 F.3d at 892 (noting that even if the suspect resisted arrest, those actions had concluded and the suspect was shot while he was in flight, warranting the denial of qualified immunity).

Finally, Patrick relies on the Supreme Court's recent decision in *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014). In *Plumhoff*, the Supreme Court emphasized that "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id*. at 2023. But here, unlike in *Plumhoff*, this circuit's precedent establishes with sufficient particularity that under the facts herein, Patrick could not shoot Foster as a suspected felon who was unarmed. Furthermore, there is a factual dispute about how violent the encounter between Patrick and Foster was *prior* to Foster's flight and Patrick's decision to shoot Foster. Finally, "[n]o subsequent controlling precedent has diminished the clarity of *Cupp*'s holding or its applicability to the present case." *Godawa*, 798 F.3d at 468.

Because the violent encounter between Foster and Patrick had concluded and Foster was merely fleeing in a police cruiser without any indication that she would harm Patrick or anyone else with the cruiser when she was shot, *Cupp* and *Bouggess* clearly establish Foster's Fourth Amendment rights.

## CONCLUSION

In sum, genuine disputes of material fact exist regarding the events that occurred when Patrick shot Foster. Under Leonard's version of the facts, a reasonable juror could conclude that Patrick's use of deadly force violated Foster's clearly established constitutional rights under the Fourth Amendment. Therefore, the district court properly denied summary judgment.

**AFFIRMED.**