NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0488n.06

No. 15-1908

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 22, 2016
DEBORAH S. HUNT, Clerk

CARMITA LEWIS, as Personal Representative for
the Estate of Dominique Lewis, Deceased,

    Plaintiff-Appellee,

v.

CHARTER TOWNSHIP OF FLINT,

    Defendant,

MATTHEW NEEDHAM, Police Officer,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

---

**BEFORE: BATCHELDER and WHITE, Circuit Judges; and LIPMAN, District Judge.**[*]

    **HELENE N. WHITE, Circuit Judge.** Dominique Lewis (Lewis) was killed after Flint Police Officer Matthew Needham (Needham) fired shots into a car Lewis was driving as Lewis attempted to flee a traffic stop. Carmita Lewis, as personal representative of Lewis's estate (the Estate), brought the instant action against the Charter Township of Flint and Needham, alleging violations of 42 U.S.C. § 1983 and state law. Prior to discovery, Defendants sought summary judgment and qualified immunity, respectively, based on a dashboard-camera video of the incident. In an order following a status conference, the district court declined to rule on the

---

[*] The Honorable Sheryl H. Lipman, United States District Judge for the Western District of Tennessee, sitting by designation.

motion at that time and provided the parties sixty days to conduct discovery. Needham appeals, and we **AFFIRM**.

## I.

## A.

When Flint Township Police Officer Janelle Stokes (Stokes) stopped Kenisha Williams (Williams) for speeding, Lewis was in the right rear passenger seat of Williams's vehicle. R. 8: First Am. Compl., PID 40–41; *see also* Video 00:23–00:32, 01:08–01:11. After asking for Williams's driver's license and returning to her cruiser, Stokes called for backup to search the vehicle based on her contention that she had smelled marijuana inside the vehicle. R. 8 at PID 41. Needham responded and arrived a few minutes later. *Id.* at PID 41–42. After Williams consented to a search, Stokes patted Williams down and allowed her to take her young daughter out of the back seat. *Id.* at PID 42; Video at 10:45–11:22. Stokes then conducted a pat down of the front passenger. Video at 11:20–11:38.

The dash-cam video then shows the following. As Stokes pats down the front passenger, who has his hands on the vehicle, Lewis climbs into the driver's seat; Stokes says, "Hey hold up," and Needham—coming into the video's view from the adjacent grass—approaches the car from the passenger side. Video at 11:38–11:41. Lewis then starts the car; at the same time, Needham runs towards then across the front of the vehicle, stopping directly in front of the driver's side and appearing to have his gun drawn and pointed at Lewis.[1] *Id.* at 11:41–11:45. Lewis accelerates the car forward; the wheels can be heard screeching. *Id.* at 11:45. When the vehicle accelerates, Needham appears to scurry a few steps to his right to get out of the vehicle's path, lowering his weapon and placing an arm on the car as he does so. *Id.* at 11:45–46. The car

_____

[1] Although according to the First Amended Complaint, Needham yelled, "Stop! Police!" (PID 43), that cannot be heard on the video.

comes very close to Needham, but does not appear to hit him. *Id.* at 11:45–11:46. As the car passes Needham he shoots into the driver's side window. *Id.* at 11:46–47. Two shots can be heard on the video. *Id.* The car then veers sharply left. *Id.* at 11:47–11:48. Lewis died as a result of gunshot wounds. R. 8 at PID 43.

This incident occurred on a three-lane road with no buildings in sight and light to moderate traffic. *See generally* Video. The video shows approximately four to five other cars in the vicinity as Lewis attempts to drive away. *Id.* at 11:45–11:48.

**B.**

The Estate filed an amended complaint on May 14, 2015. On June 30, 2015, prior to discovery, Defendants filed a motion for summary judgment and a motion to stay the proceedings pending resolution of the summary judgment motion. Defendants argued discovery was not necessary because the dash-cam video showed Needham was entitled to qualified immunity as a matter of law. The Estate did not respond to these motions. However, on July 21, 2015—the deadline for the Estate's response—the district court held a status conference. Following this conference, the district court issued an order declining to rule on Defendants' motion for summary judgment, denying the motion to stay without prejudice, and permitting the parties to conduct discovery for sixty days. Needham then filed this interlocutory appeal.[2]

**II.**

The denial of summary judgment generally is "not a 'final order'" that may be immediately appealed. *Chappell v. City of Cleveland*, 585 F.3d 901, 905 (6th Cir. 2009); *see also* 28 U.S.C. § 1291. However, "to the extent that it turns on an issue of law," a public official may immediately appeal the denial of qualified immunity. *Quigley v. Tuong Vinh Thai*, 707 F.3d

---

[2] On January 4, 2016, this court granted Defendants' motion to stay the proceedings pending appeal. *Lewis v. Charter Twp. of Flint*, No. 15-1908 (6th Cir. Jan. 4, 2016).

675, 679 (6th Cir. 2013) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005)). "Because we do not have jurisdiction over factual issues, 'a defendant must concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Id.* at 680 (quoting *Estate of Carter*, 408 F.3d at 309–10). Needham concedes the facts in the complaint for purposes of appeal to the extent they are not contradicted by the dash-cam video, and argues that based on the undisputed facts as shown in the video, he is entitled to qualified immunity. Thus, we have jurisdiction to consider this question of law.

Further, although the district court did not formally deny the motion, we have previously found that a "district court's refusal to address the merits of the defendant's motion asserting qualified immunity constitutes a conclusive determination for the purposes of allowing an interlocutory appeal." *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004).

## III.

We review de novo a district court's determination that a defendant is not entitled to qualified immunity. *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015). Although the plaintiff "bears the burden of demonstrating that [the defendant] is not entitled to qualified immunity," *id.*, "we view the facts and any inferences reasonably drawn from them in the light most favorable to" the plaintiff, *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (internal quotation marks omitted) (quoting *Griffith v. Coburn*, 473 F.3d 650, 655 (6th Cir. 2007)).

## IV.

Qualified immunity shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To demonstrate that an official is not

entitled to qualified immunity, a plaintiff "must show both that, viewing the evidence in the light most favorable to her, a constitutional right was violated and that the right was clearly established at the time of the violation." *Chappell*, 585 F.3d at 907.

### A. Constitutional Violation

An officer's use of deadly force during an arrest implicates an arrestee's Fourth Amendment right to be free from excessive force. *See Kirby v. Duva*, 530 F.3d 475, 477, 482 (6th Cir. 2008). We analyze excessive-force claims under the Fourth Amendment's objective reasonableness standard, *Graham v. Connor*, 490 U.S. 386, 395 (1989), which requires us to balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake," *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (alteration in original) (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006)). In particular, we carefully consider "the facts and circumstances of each . . . case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Burgess*, 735 F.3d at 472–73. In addition, we judge the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, . . . allow[ing] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

It has long been established that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). However, "[w]here the officer has probable cause to believe that

the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Brosseau v. Haugen*, 543 U.S. 194, 203 (2004) (alteration in original) (quoting *Garner*, 471 U.S. at 11); *see also Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 403 (6th Cir. 2015). Where a person attempts to flee in a vehicle, "police officers are 'justified in using deadly force against a driver who objectively appears ready to drive into an officer or bystander with his car," but "may not use deadly force once the car moves away, leaving the officer and bystanders in a position of safety.'" *Godawa v. Byrd*, 798 F.3d 457, 464 (6th Cir. 2015) (quoting *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014)). Thus, "where the car no longer 'presents an imminent danger,' an officer is not entitled to use deadly force to stop a fleeing suspect." *Id.* (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)).

The dash-cam video does not conclusively show that a reasonable officer would have believed Lewis posed an imminent threat of serious physical harm to Needham or others in the vicinity. Rather, viewed in the light most favorable to the Estate, it shows that Lewis—who was not suspected of any violent crime—was merely trying to flee a traffic stop in a vehicle, which alone is not sufficient to justify the use of deadly force. *See Cupp*, 430 F.3d at 773 (reasoning, "[a]lthough there was some danger to the public from Smith's driving off in a stolen police car, the danger presented by Smith was not so grave as to justify the use of deadly force."). Further, the video does not clearly show that Lewis "targeted" Needham when he accelerated the vehicle and attempted to flee. Although Lewis's intent does not matter, the facts known to Needham at the time do. *See Dickerson v. McClellan*, 101 F.3d 1151, 1155 n.3 (6th Cir. 1996) ("[W]e must consider only the facts the officers knew at the time of the alleged Fourth Amendment violation.") (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Because Needham ran in

front of the vehicle after Lewis had started the ignition and less than a second before he accelerated forward, it is not clear from the video that a reasonable officer would have perceived that Lewis was "targeting" him.

Moreover, the video strongly suggests—and Needham appears to concede—that Needham fired into the driver's side window. This fact and Needham's position at the side of the car suggest he was clear of the vehicle and not in danger when he fired his weapon. Needham contends he fired through the driver's side window only because at the time, he was "trying to dodge the vehicle." Needham Br. 21. Although that may be the case, the conclusion Needham asks the court to draw would require us to view the video in the light most favorable to Needham. However, a reasonable jury could reach a different conclusion, especially since the video appears to show Needham lowering his weapon as he jumps out of the vehicle's path, and then raising it again as the vehicle drives by him. *Cf. Hermiz v. City of Southfield*, 484 F. App'x 13, 14, 16–17 (6th Cir. 2012) (concluding "that [the officer] lacked justification to fire at least his final shot[,]" because "[e]ven if the car appeared to head toward [the officer] at one point, its single pass at five to ten miles per hour [did] not justify the inference that Hermiz posed an ongoing threat, especially considering that Hermiz's driving prior to the traffic stop presented no cause for concern.").

This court's decision in *Smith v. Cupp* is instructive. There, Smith—who was arrested for making harassing phone calls but earlier in the evening had been stopped for erratic driving by the same officer—was handcuffed in the back of a police cruiser in a parking lot. 430 F.3d at 768. While the officer was outside the car speaking with a tow-truck driver, Smith climbed into the front seat and tried to drive away in the vehicle. *Id.* at 769. The officer asserted that he and the tow-truck driver were "not more than a vehicle's length" from the cruiser, and that Smith

"rapidly accelerated directly at" them; thus, he drew his gun and fired four shots at Smith. *Id.* at 770. However, the plaintiffs contended that the officer had fired "at least the final, fatal shot" through the driver's side window; the officer "concede[d] that he fired while the patrol car was passing him, but claim[ed] he did so while jumping out of the direct path of the vehicle." *Id.* This court held that disputed facts precluded summary judgment because "a jury could conclude that [the officer] did not fire as the vehicle was bearing down on him in fear of his life," but rather that he "fired as he ran toward the driver side of the car after the car passed him." *Id.* at 774. Thus, the court found that "[t]he evidence would support a jury finding that [the officer] was never in the line of flight." *Id.*

At this juncture, the record—consisting only of the dash-cam video—presents a scenario where, as in *Cupp*, it would be possible for a jury to conclude that the officer shot at the decedent in self-defense, but a reasonable jury could also conclude that the decedent "was merely trying to flee . . . and [the officer] purposefully shot [him] under circumstances of no threat to [the officer] or others." *Cupp*, 430 F.3d at 770. That there was no video available in *Cupp* does not render it inapplicable because there are factual questions in the instant case bearing on the analysis that are not clearly depicted in the video. *See Godawa*, 798 F.3d at 463 (finding there were still disputes of fact even though video existed because "the video evidence in this case does not clearly contradict Plaintiffs' version of events, nor does it necessarily support Defendant's assertion that Godawa's vehicle 'target[ed]' him").

Needham contends, and the dissent agrees, that this court's decision in *Williams v. City of Grosse Pointe Park*, 496 F.3d 482 (6th Cir. 2007), establishes that his actions were objectively reasonable. In *Williams*, a dash-cam video showed that after an officer tried to block Williams's car with his cruiser in order to apprehend him, Williams reversed his car and hit the cruiser in an

effort to flee. 496 F.3d at 484. One of the officers present then exited the cruiser, approached Williams's vehicle, "and stuck his gun in the driver's side window, pointing his weapon at Williams's head." *Id.* Still intent on fleeing, Williams then "accelerated in an effort to move around [the] cruiser," and in doing so, "drove [his vehicle] over the curb and onto the sidewalk." *Id.* The officer, who was still holding onto the car, "was knocked down as it accelerated." *Id.* At that point, the other officer present fired several rounds at the vehicle, leaving Williams paralyzed. *Id.* The court found the shooting officer's conduct objectively reasonable because from his perspective, Williams "(1) was undeterred by having a weapon pointed at his head; (2) acted without regard for [the first officer's] safety; (3) was obviously intent on escape; and (4) was willing to risk the safety of officers, pedestrians, and other drivers in order to evade capture." *Id.* at 487. Further, the court distinguished the case from *Cupp* because unlike in *Cupp*, no "rational trier of fact could conclude that [the officer] acted unreasonably" after viewing the dash-cam video. *Id.* at 487–88.

Despite some similarities, *Williams* is distinguishable. There, the officer had far more information indicating that Williams posed an imminent threat. Specifically, the court found relevant that in attempting to escape, Williams "collided with [a] squad car," and "in spite of the fact that [an officer's] weapon was pointed at his head, . . . continued his attempted flight, driving onto a sidewalk and knocking [the officer] to the ground." *Id.* at 487. Further, the court noted that the officer knocked to the ground "was in immediate danger from" the fleeing vehicle. *Id.* Thus, unlike in the instant case, the video in *Williams* showed a situation where a reasonable jury could not have concluded that no one was ever in danger. And, unlike in *Williams*, it is not clear from the video in this case that Lewis was "undeterred by having a weapon pointed at his head"—or that a reasonable officer would have perceived as much—since Needham ran in front

of the vehicle after Lewis had already started the ignition, and just before the vehicle accelerated.[3]

Further, this is not a situation where an officer's actions are justified because a dangerous situation turned quickly into a safe one before the officer had a chance to realize the fleeing suspect no longer posed a threat. Viewed in the light most favorable to Lewis, a jury could conclude from the video that a reasonable officer would not have believed he or anyone else was ever in danger. Moreover, "the fact that a situation is rapidly evolving 'does not, by itself, permit [an officer] to use deadly force,'" *Godawa*, 798 F.3d at 466 (quoting *Cupp*, 430 F.3d at 775), and although the events here occurred within a matter of seconds, the video suggests Needham was already out of the way, and indeed had already lowered his gun, when he fired into the driver's side window. *Cf. Cupp*, 430 F.3d at 773, 774–75 (noting that although the case was "close, given the very short period of time in which [the officer] had to react," qualified immunity was not appropriate because the jury could conclude that the officer was never in danger); *Hermiz*, 484 F. App'x at 17 (finding that the court "lack[ed] jurisdiction to review the factual question regarding whether an officer had sufficient time to perceive, at the time of the last shot through the driver's-side window, that the passing car no longer present[ed] an immediate threat").

Nor is this a case where "the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car." *See Cass*, 770 F.3d at 375 (quoting *Hermiz*, 484 F. App'x at 16). Needham barely enters the video's frame until Lewis jumps into the driver's seat; thus, the only "prior interaction" apparent from the record is that Lewis was in a

---

[3] Contrary to the dissent's assertion, we do not contend that the fact that an officer puts himself in harm's way automatically renders his actions objectively unreasonable. *See* Dis. at 4. Rather, where a video does not conclusively establish that the driver targeted the officer or otherwise presented a threat, the officer's actions are not necessarily objectively reasonable.

car stopped for a traffic violation, and that Stokes claimed to have smelled marijuana. *Cf. Godawa*, 798 F.3d at 467 ("[A]lthough he was fleeing from police, Godawa was suspected of only minor offenses and posed no 'immediate threat' to Defendant or any member of the public."). There is no evidence that Needham had "a prolonged interaction with [Lewis] in which [Lewis] demonstrated a willingness to harm an officer or engage in reckless behavior." *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 346 (6th Cir. 2007); *see also Cupp*, 430 F.3d at 773 (noting that the officer's "use of force was made even more unreasonable by the fact that [the decedent] had been cooperative up to this point, and was arrested for the nonviolent offence of making harassing phone calls").

Thus, the dash-cam video, standing alone, does not establish that Needham is entitled to summary judgment on the basis that that his actions were objectively reasonable under the circumstances.

### B. Clearly Established

We must now consider whether, at the time of the incident, Lewis's rights were clearly established. *See Chappell*, 585 F.3d at 907. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Binay v. Bettendorf*, 601 F.3d 640, 651 (6th Cir. 2010) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023, (2014) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083–84 (2011)). A court should deny qualified immunity only "if, on an objective basis, it is obvious that no reasonably competent officer would have [acted in the same manner]; but if

officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

There is longstanding precedent holding that it is unreasonable for an officer to use deadly force against a suspect merely because he is fleeing arrest; rather, such force is only reasonable if the fleeing suspect presents an imminent danger to the officer or others in the vicinity. *See, e.g.*, *Garner*, 471 U.S. at 11; *Kirby*, 530 F.3d at 477. This is the case even where the suspect flees in a vehicle. *See Foster*, 806 F.3d at 889 ("[T]he flight of a felon in a police cruiser, without more, does not justify the use of deadly force"); *Cass*, 770 F.3d at 375 ("Since *Garner*, we have applied a consistent framework in assessing deadly-force claims involving vehicular flight. . . . [T]he critical question is typically whether the officer has 'reason to believe that the [fleeing] car presents an imminent danger' to 'officers and members of the public in the area.'") (citation omitted); *Sigley v. City of Parma Heights*, 437 F.3d 527, 531, 537 (6th Cir. 2006); *Cupp*, 430 F.3d at 775.

Relying on the Supreme Court's recent decision in *Mullenix v. Luna*, 136 S. Ct. 305 (2015) (per curiam), Needham contends that existing precedent did not place "the conclusion that [he] acted unreasonably in these circumstances 'beyond debate.'" Reply Br. 8 (quoting *Mullenix*, 136 S. Ct. at 309). Rather, he asserts that as in *Mullenix*, "the parties . . . argue[] cases on both sides of the issue," demonstrating that "no precedent squarely govern[s] the facts" of this case. Reply Br. 9. At most, Needham contends, his conduct falls in the "hazy border between excessive and acceptable force." *See* Reply Br. 9–10 (quoting *Mullenix*, 136 S. Ct. at 312).

In *Mullenix*, the Court held that the broad propositions articulated in *Garner* and *Graham*—that an officer may not use deadly force against a fleeing felon who does not pose an imminent threat—were insufficiently specific to clearly establish whether it was objectively

unreasonable for the officer in question to shoot at the fleeing suspect's vehicle from an overpass, notwithstanding that other officers had set up spikes nearby, and the officer had reportedly been told to "stand by." 136 S. Ct. at 306–07, 309. There, however, the officer had far more information about the imminent threat posed by the fleeing suspect, who led officers "on an 18-minute chase at speeds between 85 and 110 miles per hour," *id.* at 306, was reportedly intoxicated, "twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer," *id.* at 309. Thus, in that case, there was no question that a reasonable officer could have perceived an imminent threat of danger. However, where, as here, the facts viewed in the light most favorable to the plaintiff permit a finding that a reasonable officer would not have perceived *any* imminent threat to himself or others, the broader propositions of *Graham* and *Garner* suffice to clearly establish the right at issue. *See Cupp*, 430 F.3d at 776. Moreover, this circuit's decision in *Cupp* addressed similar factual circumstances, thereby clearly establishing the right at issue in this case.[4]

Further, although "qualified immunity protects actions in the 'hazy border between excessive and acceptable force,'" *Mullenix*, 136 S. Ct. at 312 (quoting *Brosseau*, 125 S. Ct. at 596)), "[t]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts," in order to find an officer is not entitled to qualified immunity, *Binay*, 601 F.3d at 652 (quoting, inter alia, *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)). Rather, "the *sine qua non* of the 'clearly established' inquiry is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015), *cert. denied,* 136 S. Ct. 1381 (2016) (quoting *Hope*, 536 U.S. at 741). Officers have fair warning that they may not use deadly force against a

---

[4] Because we do not rely on *Godawa* to hold that the right at issue is clearly established in this case, we find unpersuasive Needham's argument that even if the court finds a constitutional violation, the contours of the right at issue were not established on July 16, 2014—when this incident took place—because *Godawa* was not decided until 2015.

fleeing suspect where that person presents no imminent danger to the officer or others in the area. Because the video does not conclusively show whether that was the case here, Needham is not entitled to qualified immunity based on the video alone.[5]

**V.**

For these reasons, we **AFFIRM**.

___

[5] Because we reject Needham's argument that he is entitled to qualified immunity, we similarly reject his contention that the Estate's remaining claims should be dismissed because they are "inextricably intertwined" with the qualified-immunity issue.

**ALICE M. BATCHELDER, Circuit Judge, dissenting.** At the heart of the majority's analysis is its conclusion that, "Viewed in the light most favorable to Lewis, a jury could conclude from the video that a reasonable officer would not have believed [that Officer Needham] or anyone else was ever in danger." Maj. Op. 10. *No one* was *ever* in danger? That is not the video I have reviewed.

To begin with, it is simply not true that, as majority puts it, "the video does not clearly show that Lewis 'targeted' Needham when he accelerated the vehicle and attempted to flee." Maj. Op. 6. What it actually shows is that, after he perceived that Lewis was clambering *over the seat back from the back seat into the driver's seat*, Officer Needham began to run in front of the car to stop Lewis from escaping, drawing his weapon. At the moment Lewis began driving forward, the road ahead of him was clear of obstacles and traffic with the exception of the presence of Officer Needham. Then, the video shows with a clarity that no reasonable juror could ignore that, as Lewis was accelerating, Needham was moving *out* of the car's path, eventually exiting it, at which point Lewis swerved *toward* him. If swerving a car at someone is not "targeting," I do not know what is.

Needham was of course no longer in front of the car when he opened fire, but this is far from dispositive. "An officer may . . . fire at a fleeing vehicle even when no one is in the vehicle's direct path when 'the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car.'" *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014) (quoting *Hermiz v. City of Southfield*, 484 F. App'x 13, 16 (6th Cir. 2012)). There is no dispute that there was traffic in the immediate vicinity. And though the underlying crime—marijuana possession—was not serious, Lewis's actions, including his deliberate and reckless operation of the vehicle (a violent felony under Michigan law, Mich. Comp. Laws § 750.81d),

which Officer Needham had just barely escaped, provided ample reason for him to believe that Lewis posed an immediate and serious threat to his and others' safety, justifying the use of deadly force. As was the case in *Williams v. City of Grosse Pointe Park*, "there can be no question that [the driver's] reckless disregard for the safety of those around him in attempting to escape posed a threat to anyone within the vicinity." 496 F.3d 482, 487 (6th Cir. 2007). Indeed, like the suspect in *Williams*, Lewis was apparently undeterred by having a gun pointed at him, was hell-bent on escaping, and was willing to risk the safety of others in order to get away. *See Id.* at 486–87.

The majority contends that the timing and circumstances of this incident make it distinguishable from *Williams*. Of course, no two excessive force cases are exactly alike, and I grant that the situation in that case was in some ways more extreme. For instance, the underlying crime in *Williams*—auto theft—was more serious than marijuana possession, though, notably, both are non-violent offenses. Also, at the time of the shooting, the suspect in *Williams* had, in his attempt to escape, already collided with a police car and had left no doubt that having a gun pointed at him just inches from his head was not going to deter him from escaping. *See id.* at 484. But in other ways, the situation in that case was *less* serious. There were no pedestrians or civilian vehicles nearby, and the officer was *behind* the car when he opened fire, not beside it. *Id.* Moreover, unlike this case, the suspect in *Williams* was, at the time he was shot, attempting to navigate around the officer's car with a view toward escaping, not toward running anyone down. *Id.*

What matters, and what the majority fails to acknowledge, is that in both cases the officers faced "a rapidly unfolding situation [and] ha[d] probable cause to believe that [the] suspect pose[d] a serious physical threat either to the police or members of the public," a fact that

categorically justifies the use of deadly force. *Id.* (citing *Dudley v. Eden*, 260 F.3d 722, 726–27 (6th Cir. 2001); *Scott v. Clay County*, 205 F.3d 867, 871–73 (6th Cir. 2000)).

And even if it were true that *Williams* is not on point, and even if a reasonable jury could conclude that any threat to those in the vicinity had dissipated by the time Officer Needham entered the comparative safety of being beside the swerving car rather than in its immediate path, the fact remains that he opened fire less than *one second* after he had escaped from what can only be described as mortal peril. There is thus no basis for the majority's conclusion that Officer Needham violated the Constitution because, even accepting this construction of the facts, the decision to shoot was not unreasonable—it would be a quintessential example of "a dangerous situation [that] evolved quickly to a safe one before the police officer had a chance to realize the change." *Smith v. Cupp*, 430 F.3d 766, 774–75 (6th Cir. 2005). The majority stresses the fact that Needham lowered his gun as having some significance on this point. But they ignore the context: the video, again with indisputable clarity, reveals that Needham lowered his weapon and began moving out of the car's path as soon as Lewis began driving away and that he raised it again *only after* Lewis began to swerve toward him.

Unlike *Cupp* and *Godawa*, which both involved material disputes about what exactly happened at the critical moments, *see Cupp*, 430 F.3d at 774 (6th Cir. 2005); *Godawa v. Byrd*, 798 F.3d 457, 466 (6th Cir. 2015), there is nothing murky or indeterminate about the video that could be construed in the plaintiff's favor here. Unlike *Cupp*, this is not a case where a reasonable jury could conclude that the officer was "running towards the . . . car" at the time he opened fire. 430 F.3d at 774. Nor would anyone conclude that Officer Needham "was never in the line of flight" and, hence, was "never in any danger." *Id.* And unlike in *Godawa*, there is nothing in the record suggesting that Needham "initiated the contact" between himself and the

car, that the car "did not drive in a manner that endangered [his] life," or that he "was effectively chasing" the car at the time he opened fire. 798 F.3d at 463–65.

These distinctions matter, and we are wrong to ignore them. Contrary to the majority's apparent preference here, the fact that an officer put himself in harm's way does not mean that his actions were therefore objectively unreasonable. *See Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008). Indeed, all else being equal, the decision to stand with gun drawn in front of a stationary vehicle whose driver appears to be getting ready to flee is not a constitutional violation, much less a clearly established one. *See Estate of Starks v. Enyart*, 5 F.3d 230, 233–34 (7th Cir. 1993) ("[I]f Black had been in front of the vehicle before the car started forward, all three officers could have fired and would be protected by qualified immunity.").

Officer Needham's split-second decision to shoot did not violate Lewis's right to be free from excessive force. He—along with all except those who are "plainly incompetent or . . . knowingly violate the law"—is therefore entitled to qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In refusing to grant such immunity here, the majority adds confusion not only to law of this circuit, but also to the difficult task faced by law enforcement in applying what we say is clearly established law. How exactly we expect them to conform their actions to the rule purportedly applied in this case is beyond me. I suppose they will conclude that they must stand idly by, obstructing would-be escapees with nothing more than entreaties to stop. That is not the law, nor should it be. The district court's order denying summary judgment in Officer Needham's favor should therefore be reversed.[1] I dissent.

---

[1] If my views had prevailed in this case, the normal course would have been for us to use our pendent appellate jurisdiction to also direct entry of summary judgment in the Charter Township of Flint's favor. *See Lane v. City of LaFollette, Tenn.*, 490 F.3d 410, 423 (6th Cir. 2007). But the notice of appeal mentions only Officer Needham in his individual capacity, and nothing in that document suggests that Flint intended to appeal. *See* Fed. R.

App. P. 3(a)(2), (c)(1), (c)(4).  We would thus not have jurisdiction to rule on that issue.  Similarly, I also would not reach the Estate's remaining claims, but would leave them for the district court to decide in the first instance.