NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0232n.06

Case Nos. 22-1572/1575

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
May 19, 2023
DEBORAH S. HUNT, Clerk

JIMMY DAN LEFTWICH, et al.,

    Plaintiffs-Appellees,

v.

MARK DRISCOLL, et al.,

    Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

---

Before: SUTTON, Chief Judge; SILER and MATHIS, Circuit Judges.

SILER, Circuit Judge. Jimmy Dan Leftwich ("Leftwich") and his wife Lisa ("Mrs. Leftwich" and collectively "Plaintiffs") sued Mark Driscoll ("Driscoll") and William Baugh ("Baugh" and collectively "Defendants") after Leftwich was shot by Defendants while standing inside his home holding a pistol. Defendants filed motions for summary judgment, asserting their entitlement to qualified immunity. The district court denied Defendants' motions. We **AFFIRM**.

**I.**

In 2019, the Gibraltar, Michigan, Police Department received a 911 call that a man had stepped outside his home and fired multiple pistol rounds. The caller identified neither the shooter nor the shooter's home address, only that the shots had come from a house located to the right of where the caller lived and there was a white truck parked in the shooter's driveway. Multiple police officers responded to the scene, including Gibraltar Police Sergeant Steven McInchak,

Gibraltar officer Zachariah Phillips, and Defendants Driscoll (of the Trenton Police Department) and Baugh (of the Rockwood Police Department). Because McInchak and Phillips were the only two Gibraltar police officers on duty, Driscoll and Baugh responded pursuant to a mutual aid agreement. McInchak instructed the responding officers to carry their patrol rifles.

When the officers arrived on the scene, it was dark. They initially thought that the shooter's home was located next to the Leftwich home, and Driscoll stepped onto the Leftwich's front porch to get a better view of the home next door. When Driscoll heard talking inside the Leftwich home, he quickly stepped off the porch. At this point, the parties disagree about what transpired.

Driscoll and Baugh testified that, as the officers were in front of Plaintiffs' home, Leftwich opened his front door, racked a round into his pistol, stepped onto the front porch, and pointed the gun at Phillips. Baugh testified that Phillips "would have been to my left or behind me," and Driscoll testified that Phillips was "[s]omewhere behind me." Driscoll and Baugh then both shouted "let me see your hands" and immediately discharged a total of six rounds (one by Baugh and five by Driscoll) toward Plaintiffs, one of which grazed Leftwich's head. Defendants recovered Leftwich's gun, which was loaded and had one round in the chamber.

Phillips, who is not a party to the dispute, testified that while the officers were in front of the Leftwich house, the front door opened, and he then heard "the sound of a racking of a slide from a pistol or a handgun or a firearm." He stated he then heard someone shout "gun" followed by four or five rifle shots. Phillips testified that he did not fire his weapon because he neither saw Leftwich holding a firearm nor racking it. He then took Mrs. Leftwich, who was uninjured, into protective custody.[1]

---

[1] The fourth officer, McInchak, was also on the scene. However, he was talking with the individual who made the 911 call and only heard Defendants shoot at Leftwich.

Finally, Leftwich testified that he opened the front door after hearing "commotion out in front of [his] house." The officers never identified themselves as police officers before using deadly force. When Leftwich opened the door, he testified he was holding his pistol in his right hand but never stepped outside. He also said that the pistol was down at his side, and he never racked a round into the chamber. When the bullet grazed Leftwich's head, Leftwich's body came to rest about six feet inside his home.

It is undisputed that approximately three seconds elapsed from the time Leftwich started opening the door to the first shot. And the entire confrontation, from the time Leftwich started opening the door until the final shots were fired, lasted about six seconds. Leftwich was taken to the hospital with a minor head wound and discharged the same evening.

Plaintiffs filed suit, alleging nine counts against numerous entities. However, the district court granted summary judgment for all defendants on all claims except for an excessive force claim against Baugh and Driscoll for firing their rifles at Plaintiffs. Defendants filed motions for summary judgment, arguing that they were entitled to qualified immunity. The district court denied their motions, stating that "[g]enuine issues of material fact exist which preclude the Court from deciding whether Baugh and Driscoll's use of deadly force was reasonable under the circumstances for purposes of qualified immunity." Defendants appeal.[2]

## II.

A denial of summary judgment on qualified immunity grounds is reviewed de novo, *Nelson v. City of Madison Heights*, 845 F.3d 695, 699 (6th Cir. 2017) (citation omitted), and we may

---

[2] Neither party contests that we have jurisdiction over this interlocutory appeal. The parties raise both legal and factual issues, so we have jurisdiction to review. *See Chappell v. City of Cleveland*, 585 F.3d 901, 905–06 (6th Cir. 2009).

affirm the district court "on any grounds supported by the record, even if different from those relied on by the district court," *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 877 (6th Cir. 2020) (quotation marks and citation omitted).

In reviewing an excessive force claim, this court "limit[s] the scope of [its] inquiry to the moments preceding the shooting." *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996). Although Plaintiffs bear the burden of demonstrating that Defendants are not entitled to qualified immunity, we view all facts in the light most favorable to Plaintiffs. *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015) (citation omitted). If there is video evidence, we take the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). However, if the video evidence "can be interpreted in multiple ways or if [the] videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

A government official is entitled to qualified immunity unless the plaintiff can establish that "(1) the facts show a violation of a constitutional right, and (2) the right at issue was clearly established when the event occurred such that a reasonable officer would have known that his conduct violated the plaintiff's constitutional right." *Foster*, 806 F.3d at 886 (cleaned up) (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)).

## A.

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The Fourth Amendment guarantees citizens the right to be free from unreasonable seizures, and a court must look to the totality of the circumstances to determine whether an officer used excessive force. *Graham v. Connor*, 490 U.S. 386, 396 (1989). We use the following factors in evaluating whether

an officer's use of force was constitutionally reasonable: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Garner*, 471 U.S. at 8–9). The reasonableness inquiry "is an objective one" that does not account for an officer's "evil" or "good" intentions and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396–97 (citations omitted).

The first factor, the severity of the crime, weighs in Leftwich's favor. The officers were in Leftwich's neighborhood to investigate the discharge of multiple pistol rounds, which is a possible misdemeanor. *See* Mich. Comp. Laws § 752.863a. However, Defendants did not know that Leftwich was the one who had fired his pistol when they used deadly force against him. Because "the reasonableness of an officer's actions is limited to what the officer could have known at the time," Defendants cannot rely on Leftwich's supposed previous pistol shots to justify their use of deadly force. *Redrick v. City of Akron*, No. 21-3027, 2021 WL 5298538, at *3 (6th Cir. Nov. 15, 2021) (citing *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007)). To the extent Defendants argue they used deadly force in response to Leftwich's alleged racking of his pistol, racking a firearm, particularly in one's own home, is not a crime. Therefore, under the first factor, Defendants cannot rely on the alleged racking of a firearm to justify their use of force.

The second factor, whether Leftwich posed an immediate threat to Defendants or others, also weighs in Leftwich's favor. Defendants argue that Leftwich posed an immediate threat to the officers when he racked his pistol and pointed it at Phillips. When an individual is armed, the reasonableness of an officer's fear and subsequent use of deadly force often turns on whether the firearm is pointed at another person. *See, e.g.*, *Hicks v. Scott*, 958 F.3d 421, 435–36 (6th Cir. 2020)

(collecting cases). When a factual dispute exists as to whether a plaintiff's gun is pointed at another person when officers use deadly force, as in this case, qualified immunity is inappropriate. *See, e.g.*, *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989).

Defendants contend that even apart from whether Leftwich's pistol was pointed at Phillips, the fact that he opened his front door and racked a weapon justified deadly force. It does not. First, the racking of the firearm is also disputed. Second, even assuming Leftwich racked his pistol, this action alone is insufficient to justify deadly force. Taking the facts in the light most favorable to Leftwich, Defendants used deadly force against Leftwich when all they knew was that he had opened his front door and likely had a loaded weapon—he had made no threatening remarks and had not pointed his pistol at anyone. Instead, Leftwich armed himself and opened his front door in response to a "commotion out in front of [his] house" in the middle of the night. On these facts, we cannot say that Leftwich posed "an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. We agree with our sister circuit's recent holding that "[r]acking a [firearm] inside one's home, without more, is no more threatening than coming to the door with any other loaded firearm. Indeed, any reasonable officer would presume that an individual carrying a firearm has already loaded it." *Knibbs v. Momphard*, 30 F.4th 200, 219 (4th Cir. 2022) (citing *McLaughlin v. United States*, 476 U.S. 16, 17 (1986)).

The third factor, active resistance, also weighs in Leftwich's favor. Defendants have not claimed that Leftwich resisted arrest or attempted to flee. He was, after all, in his own home. To the extent Defendants argue they commanded Leftwich to show his hands before they opened fire, the commands to show his hands and the gunfire were essentially simultaneous, and Leftwich did not have time to respond. But even if he had failed to comply with Defendants' commands, "noncompliance alone does not indicate active resistance; there must be something more."

*Eldridge v. Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). Viewing the facts in the light most favorable to Plaintiffs, there was nothing more in this case. Accordingly, applying the *Graham* factors, Defendants' firing of their weapons at Leftwich constituted excessive force in violation of the Fourth Amendment.

**B.**

Accepting Plaintiffs' account of the facts, Defendants violated Plaintiffs' clearly established rights by using deadly force against them following Leftwich's opening his front door while holding a pistol but without pointing it at anyone. A right is clearly established if "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hearring v. Sliwowski*, 712 F.3d 275, 279 (6th Cir. 2013) (cleaned up and citations omitted). Although there does not have to be a case precisely on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (holding that "an officer might lose qualified immunity even if there is no reported case directly on point" if, "in the light of pre-existing law, the unlawfulness of the officer's conduct" is "apparent" (quotation marks and citations omitted)).

Here, the question is whether it was clearly established in 2019 that police officers could not use deadly force against a homeowner who, although investigating a nighttime disturbance with a firearm, was not threatening the officers with imminent deadly harm. It was clearly established in 2019 that an individual had the right to arm himself for the purpose of self-defense in his own home. *See District of Columbia v. Heller*, 554 U.S. 570, 628–29 (2008). Also, it was clearly established that an individual had the right not to be shot unless there was "probable cause to believe that they pose a threat of serious physical harm, either to the officer or to others."

*Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (cleaned up and citation omitted). And we have repeatedly held that when a suspect possesses a weapon but does not have it pointed at anyone, qualified immunity is generally inappropriate. *See, e.g.*, *Hicks*, 958 F.3d at 435–36 (collecting cases). Therefore, it was clearly established in 2019 that an individual had the right to possess a weapon for self-defense in his own home and cannot be shot simply for possessing a weapon in a nonthreatening manner.

Defendants used deadly force against Leftwich only three seconds after he opened his front door while holding a pistol within his home. Although Defendants believed they heard Leftwich rack his pistol, he was holding his pistol down at his side when he opened the door. Because the contours of Plaintiffs' constitutional rights were sufficiently definite in 2019, we hold that clearly established law precluded Driscoll and Baugh from using excessive force against the Plaintiffs.

**AFFIRMED**.