RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0129p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

SEAN HART; TIFFANY GUZMAN,

        *Plaintiffs-Appellants,*

    *v.*

CITY OF GRAND RAPIDS, MICHIGAN; PHILLIP REININK, BRAD BUSH, and BENJAMIN JOHNSON, Officers, in their individual and official capacities,

        *Defendants-Appellees.*

No. 23-1382

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cv-00899—Jane M. Beckering, District Judge.

Argued: June 13, 2024

Decided and Filed: May 15, 2025

Before: GILMAN, STRANCH, and LARSEN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Christopher P. Desmond, JOHNSON LAW, PLC, Detroit, Michigan, for Appellants. Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees City of Grand Rapids and Officers Bush and Johnson. Marcelyn A. Stepanski, ROSATI, SCHULTZ JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Officer Reinink. **ON BRIEF:** Christopher P. Desmond, JOHNSON LAW, PLC, Detroit, Michigan, for Appellants. Douglas J. Curlew, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia, Michigan, for Appellees City of Grand Rapids and Officers Bush and Johnson. Marcelyn A. Stepanski, ROSATI, SCHULTZ JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Officer Reinink.

      STRANCH, J., delivered the opinion of the court in which GILMAN, J., concurred, and LARSEN, J., concurred in part. LARSEN, J. (pp. 20–23), delivered a separate opinion dissenting in part.

———————————

**OPINION**

———————————

JANE B. STRANCH, Circuit Judge.  Sean Hart and Tiffany Guzman appeal the district court's dismissal of their excessive force claims under 42 U.S.C. § 1983 against the City of Grand Rapids, Sergeant Brad Bush, and Officers Benjamin Johnson and Phillip Reinink.  Hart and Guzman claim that the officers employed excessive force during a 2020 Black Lives Matter demonstration in Grand Rapids and that the City ratified this unlawful conduct.  The officers moved for summary judgment based on qualified immunity, and the City moved for summary judgment based on the failure of Hart and Guzman to establish municipal liability.  The district court granted the motions, dismissing the federal claims and declining to exercise jurisdiction over Hart and Guzman's state law claims.  For the reasons that follow, we **AFFIRM** the grant of summary judgment based on qualified immunity as to Officer Johnson and Sergeant Bush and **AFFIRM** the grant of summary judgment in favor of the City, but we **REVERSE** the grant of summary judgment based on qualified immunity as to Officer Reinink, and **REMAND** for further proceedings on that claim.

**I.  BACKGROUND**

The facts of this case are largely undisputed.  Around 8:30 p.m., on May 30, 2020, after fishing near Grand Rapids, Michigan, Sean Hart and Tiffany Guzman heard sirens and began driving downtown.  There, a crowd had gathered for a racial justice demonstration.  Based on reports of violence at similar demonstrations across the country, members of the Grand Rapids Police Department (GRPD)'s Special Response Team (SRT) were stationed around the crowd.

SRT had prepared "crowd control" packs containing specialty munitions, which included Muzzle Blast, designed to be fired at individuals at close range, and Spede-Heat, intended for long-range firing at crowds.  Muzzle Blast and Spede-Heat can be fired using the same 40-millimeter launcher, and their cartridges look similar.  But as described in Officer Reinink's incident report, "[a] Muzzle Blast 40mm round is a powder dispersion round," and "is used as a crowd control management tool for intermediate and close deployment."  In contrast, Spede-Heat

munitions, which contain cannisters of a chemical "commonly known as tear gas[,] . . . w[ere] designed to be launched into a target area and not directly at a subject."

Around 7:45 p.m., some demonstrators began to surround officers and throw items, including rocks, bricks and bottles containing unknown substances at them; that behavior continued to escalate, and included property damage and increasing crowd volatility and violence. Officers issued orders using the public announcement system, notifying listeners that failure to disperse could result in arrest or other officer intervention, such as the use of chemical agents or less-than-lethal munitions that could nonetheless result in serious injury. The district court found that "[t]he hours of video footage provided by the parties confirm that downtown, initially the site of a peaceful protest, had become complete mayhem."

When Hart and Guzman arrived downtown, they observed "people going crazy," "breaking windows" and "[t]hrowing things." Around 11:40 p.m., Hart and Guzman arrived at an intersection by a police line, where they lingered, playing the N.W.A. song "F**k tha Police." Officers had cleared the intersection earlier. About two minutes after Hart and Guzman's arrival, a group of three officers, concerned that the car would drive into the police line, approached the vehicle. Officer Benjamin Johnson approached the vehicle with his launcher loaded with Muzzle Blast, poised in the "high ready" position, and pointed toward the passenger side of the vehicle where Guzman sat. Officer Johnson commanded Hart and Guzman to leave the area, which they eventually did.

But less than two minutes later, Hart and Guzman returned. Hart parked and exited the car, leaving his door open, and approached the officer line, placing his left hand in his pocket. Sergeant Brad Bush and Officer Phillip Reinink, both standing in the officer line, were unsure of Hart's intentions and feared that Hart might assault the officers. As Hart approached, officers yelled at him to get back.

Hart stopped several feet from the officer line, withdrew his left hand from his pocket and pointed at the police line; he was unarmed. Sergeant Bush then stepped forward to meet Hart and fired pepper spray at Hart's head for two to three seconds. On impact, Hart turned and took a few steps away from the officer line, lifted his head, took a drag from the cigarette he held in

his right hand, and began to turn back to face the officers again. Bystander video recordings show Office Reinink left the police line to confront Hart after Sergeant Bush began pepper spraying him and Hart had started to retreat. As Hart was turning back toward the police line, Officer Reinink launched a Spede-Heat cannister at Hart, who was then "a few feet away." Reinink testified that he believed the canister—which he loaded without a witness, contrary to GRPD policy—contained Muzzle Blast; however, it was Spede-Heat. The cannister hit Hart's left shoulder area. Hart remained on his feet, turned around, flicked his cigarette on the ground, and "flipped off" the officers before walking back to his car.

Once back in the car, Hart drove slowly toward the officers, stopped, and revved his engine while the crowd cheered. Hart stuck his left hand out of the car window and raised his middle finger at the police before driving over the median. "F**k tha Police" continued playing from the car window; a man got on top of the car, and officers called out additional dispersal orders, warning that those who remained would be in violation of state law. Less than a minute later, Hart drove away.

Hart received treatment at the emergency room for left shoulder pain from the Spede-Heat cannister and eye irritation from the pepper spray. Photos corroborate Hart's testimony that the impact from the canister left an abrasion and bruising on his left shoulder. Guzman had no physical injuries. Officer Reinink was investigated for excessive force and GRPD sustained that charge. The GRPD's investigation also concluded that Officer Reinink violated the department's procedures by loading his launcher with a specialty munition, Spede-Heat, without a witness and by turning off and not reactivating his body camera earlier that day. GRPD Chief Eric Payne disciplined Officer Reinink with two days of unpaid leave.

Plaintiffs filed this lawsuit on September 16, 2020; their operative complaint contains three counts: (1) excessive force in violation of the Fourth and Fourteenth Amendments against Officers Reinink, Bush, and Johnson; (2) failure to train, inadequate policies and procedures, and illegal custom and practices against the City of Grand Rapids (City); and (3) state law claims against Officers Reinink, Bush, and Johnson. At the close of discovery, the City, Sergeant Bush, and Officer Johnson filed a joint motion for summary judgment; Officer Reinink filed a separate motion for summary judgment. On March 31, 2023, the district court granted

the defendants' motions as to the federal claims, dismissing them with prejudice, and declined jurisdiction as to the state claims, dismissing them without prejudice. Plaintiffs timely appealed.

## II. ANALYSIS

We review a district court's order granting summary judgment de novo. *King v. Steward Trumbull Mem'l Hosp. Inc.*, 30 F.4th 551, 559 (6th Cir. 2022). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(c)); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). We "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion,'" but insofar as the events at issue are recorded on video, we will not adopt a version of the facts that is "blatantly contradicted by the" video evidence, such "that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007) (brackets omitted) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

### A. Claims Against the Officers

To prevail on a § 1983 claim, a plaintiff must demonstrate "(1) the deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under the color of state law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015). "Government officials," however, "are entitled to qualified immunity from civil suits for damages arising out of the performance of their official duties as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994). In the context of excessive-force claims, the qualified immunity inquiry is "(1) whether the officer violated the plaintiff's constitutional rights under the Fourth Amendment; and (2) whether that constitutional right was clearly established at the time of the incident." *Est. of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017) (quoting *Kent v. Oakland County*, 810 F.3d 384, 390 (6th Cir. 2016)). A reviewing court may address these prongs in either order, determining "in light of the circumstances in the particular case at hand" which step

in its "sound discretion" it makes sense to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Under this standard, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning." *United States v. Lanier*, 520 U.S. 259, 271 (1997). In some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Id.* (quoting *Anderson*, 483 U.S. at 640). The touchstone of this analysis is whether the official received "fair warning" that his conduct was unlawful, such that "existing precedent . . . placed the statutory or constitutional question beyond debate"; "the specific conduct," however, "need not have been found unconstitutional." *Baynes*, 799 F.3d at 613 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). Whether the officer violated clearly established law and whether the plaintiff offered "evidence sufficient to create a genuine issue as to whether the defendant in fact committed" the unlawful act are both "questions of law for the court to decide." *Adams*, 31 F.3d at 386. Beyond that, "weighing the evidence and determining whether an officer should be liable are tasks exclusively for the jury." *Baynes*, 799 F.3d at 615.

"The sole constitutional standard for evaluating excessive force claims is the Fourth Amendment's criterion of reasonableness." *Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004). We apply "an 'objective reasonableness' standard" to excessive force claims. *Baynes*, 799 F.3d at 607 (quoting *Morrison v. Bd. Of Trs. Of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)). Intent is irrelevant: "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

In reviewing an excessive force claim, a court must "balance the government's interests in protecting others (including the police) and curbing crime against a suspect's right [] not to be injured." *Puskas v. Delaware County*, 56 F.4th 1088, 1093 (6th Cir. 2024). This is a fact-

intensive inquiry, requiring particular attention to "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Taking into consideration "that police officers are often forced to make split-second judgments" under "tense, uncertain, and rapidly evolving" conditions, the "particular use of force must be judged from the perspective of a reasonable officer on the scene," not "with the 20/20 vision of hindsight." *Id.* at 396–97.

When reviewing a case involving allegations of multiple instances of excessive force, we must "analyze the claims separately." *Gaddis*, 364 F.3d at 772 (ellipses omitted) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996)). Under this analysis, we "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Dickerson*, 101 F.3d at 1161 (quoting *Plakas v. Drinski*, 119 F.3d 1143, 1150 (7th Cir. 1994)). "When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam)). In keeping with this precedent, and consistent with the approach of the district court, we analyze each contested use of force by each officer separately below.

### 1. Officer Johnson

Guzman claims that Officer Johnson engaged in excessive force when he pointed the launcher, which she believed was a gun, at her, an exchange that was captured on video. We begin with the second qualified immunity prong: whether the constitutional "right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Here, Hart and Guzman stopped at an intersection located near the police line, playing the song, "F**k tha Police," loudly with the car windows down. This occurred after GRPD's initial dispersal orders, which Guzman and Hart stated they did not hear. Three officers, including Officer Johnson, then approached the passenger's side of the vehicle. Officer Johnson held a

launcher containing Muzzle Blast, which Guzman testified she believed was a gun, and pointed it at the passenger-side window.

The district court determined that the plaintiffs failed to produce "any existing precedent on this issue," and granted qualified immunity because the plaintiffs "ha[d] not shown that Officer Johnson violated a clearly established right." Guzman argues on appeal that Officer Johnson employed excessive force by pointing the launcher, which she believed was a firearm, at her, which caused Guzman to fear for her life. She relies on the holding in *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010), that detaining a suspect at gunpoint can constitute excessive force under the Fourth Amendment. Guzman also points to a Ninth Circuit decision, *Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002) (en banc), cited with approval in *Binay*, 601 F.3d at 650, for the proposition that pointing a gun at an unarmed suspect who poses no danger constitutes excessive force.

We begin with the applicability of *Binay*'s principles to Guzman's situation. *Binay* concerned an officer holding the plaintiffs—who "had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee"—at gunpoint while executing a search warrant for the plaintiffs' apartment. *Binay*, 601 F.3d at 644–45, 650. The search took about an hour. *Id.* at 644. Here, Officer Johnson approached Hart and Guzman in the context of an ongoing, disorderly demonstration in the public streets, not in a private home. Hart and Guzman aver that they had not heard the dispersal orders, but from Officer Johnson's perspective, the pair appeared to ignore or resist that command by driving toward the police line. The encounter took place over a couple of minutes, not an hour. And, as emphasized by the district court, the officers in *Binay* pointed an actual gun capable of inflicting lethal force, whereas here, Officer Johnson carried a launcher loaded with non-lethal chemical spray. The context of Officer Johnson's interaction with Hart and Guzman, then, is distinct on several key bases from *Binay*.

*Robinson* is also distinguishable. Although the court concluded that "pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment," 278 F.3d at 1015, *Robinson* involved officers pointing a gun at plaintiff's head as he exited his home, *id.* at 1010. Here, Officer Johnson approached Hart and Guzman in

their car, a context where "the risk of a violent encounter," *Arizona v. Johnson*, 555 U.S. 323, 331 (2009), arises "from the fact that evidence of a more serious crime might be uncovered during the stop," *id.* (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)). The tense scene surrounding the car added to the risk that a reasonable officer would perceive. On the facts of this case, we cannot say that a clearly established constitutional right was violated by the actions of Officer Johnson. We therefore affirm the district court's grant of summary judgment to Officer Johnson based on qualified immunity.

### 2. Sergeant Bush

Turning to Sergeant Bush's deployment of pepper spray, an interaction that was also documented on video, we again begin the analysis with the second qualified immunity prong: whether the constitutional "right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier*, 533 U.S. at 201).

After Hart's and Guzman's initial encounter with GRPD officers, Hart drove away from the officer line. Shortly thereafter, Hart and Guzman drove back to the intersection, where Hart parked his vehicle around 50 feet from the line of police officers, left the driver's side door open, and approached the line of police. Sergeant Bush then sprayed Hart with pepper spray from eight to ten feet away.

On appeal, Hart relies on three cases to show that Sergeant Bush violated clearly established law when deploying pepper spray: *Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020); *Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009); and *Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006). *Wright* concerned plain-clothes officers' deployment of a taser and pepper spray on an unarmed man in a parked vehicle. 962 F.3d at 860. We concluded "that the right to be free from being pepper sprayed when a suspect is not actively resisting arrest was . . . clearly established" at the time of that incident. *Id.* at 871. Unlike in *Wright*, however, here the record shows that Hart actively disobeyed officers' orders in advancing toward the police line. *Wright* thus does not provide clearly established precedent applicable here.

In *Grawey*, as the district court emphasized, the plaintiff was passively awaiting police arrival, not advancing toward officers, when officers assaulted him with pepper spray. *Grawey*,

567 F.3d at 307, 311.  And unlike *Grawey*, where officers' use of pepper spray occurred at such a "close range," that the force subjected the plaintiff to "an intense burning" that caused him to "collaps[e] to the sidewalk, unconscious," *id.* at 307, Sergeant Bush did not "spray Hart with enough pepper spray to cause Hart to lose even the ability to walk or drive away," which he did. Given the factual distinctions between the use of pepper spray in *Grawey* and Sergeant Bush's pepper spraying of Hart, Hart cannot rely on *Grawey* to establish that Sergeant Bush's conduct violated clearly established law.

*Ciminillo* presents a more similar context; the plaintiff's claims there also stemmed from police attempting to disperse a crowd during a riot.  There, officers had ordered a crowd to disperse after it "had become rowdy" and some of its members "set fires in the street" and "were throwing bottles at police officers and civilians." *Ciminillo*, 434 F.3d at 463.  Unlike Hart, the plaintiff in *Ciminillo* was slowly walking toward an officer with his hands above his head when the officer shot him "allegedly without provocation and at point blank range" with "a beanbag propellant." *Id.*  We held that "[t]he use of less-than-deadly force in the context of a riot against an individual displaying no aggression is not reasonable." *Id.* at 468.  Here, Hart was not attempting to leave, but had driven back to the scene, exited his car, and was approaching the police line to confront the officers when Sergeant Bush pepper sprayed him.  Hart's provocative advance toward the officer line sufficiently distinguishes his conduct from that in *Ciminillo*.

In sum, none of the cases that Hart cites establish that it was "beyond debate" at the time of this incident that Sergeant Bush's pepper spraying of Hart was unlawful.  *See District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  We therefore affirm the district court's grant of summary judgment to Sergeant Bush.

### 3. Officer Reinink

Hart alleges that Officer Reinink used lethal force against him.  When Sergeant Bush pepper sprayed Hart, Hart turned away and retreated from the police line.  As Hart began to turn around again, Officer Reinink fired a Spede-Heat canister, which is intended for long-range deployment, directly at Hart, who was located several feet away from the officers, striking his left shoulder area.

We begin with whether Officer Reinink's use of a Spede-Heat munition constituted deadly force.  Officer Reinink argues that the district court appropriately analyzed his mistaken discharge of Spede-Heat as the use of "the wrong non-lethal munition" in tumultuous circumstances.  At his deposition, however, Officer Reinink admitted that he was trained that some uses of Spede-Heat could result in serious injury and even death, and thus, Spede-Heat could "be considered a deadly weapon."  Deposition testimony by others corroborates this understanding.    For instance, as GRPD Lieutenant Matthew Ungrey—the SRT unit commander—explained, Spede-Heat cannisters' "muzzle velocity" requires the munition be shot into the air at an angle of 45 to 60 degrees and not directly at a person "unless it would be a life or death situation" because it would "absolutely" constitute lethal force.  Likewise, GRPD Chief Eric Payne acknowledged that firing Spede-Heat at a person "at . . . that distance is considered potential deadly force."

It is true that the record contains some support for the inference that Officer Reinink had intended to deploy Muzzle Blast and mistakenly fired the Spede-Heat canister.  But, under governing law, officer intent is irrelevant.  *Graham*, 490 U.S. at 397; *see also Henry v. Purnell*, 652 F.3d 524, 532 (4th Cir. 2011) (ignoring the officer's intent when he alleged that he mistakenly fired his gun instead of his Taser at a fleeing suspect).  Viewing the record evidence in the light most favorable to Hart, as we must, Officer Reinink did deploy Spede-Heat at close range, such that it could have exerted lethal force.  Though deadly force precedent centers on firearms, the reasoning of these cases clarifies that it is the nature of the force, not the weapon, that matters.  *See, e.g.*, *Walker v. Davis*, 649 F.3d 502, 503-04 (6th Cir. 2011) (recognizing that "ramming a motorcycle with a police cruiser involves the application of potentially deadly force"); *see also Tennessee v. Garner*, 471 U.S. 1, 9 (1985) ("The intrusiveness of a seizure by means of deadly force is unmatched.  The suspect's fundamental interest in his own life need not be elaborated upon.").  Thus, we evaluate Officer Reinink's firing of the Spede-Heat under the deadly force rubric.

"Qualified immunity in cases involving claims of deadly force is difficult to determine on summary judgment because liability turns upon the Fourth Amendment's reasonableness test." *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 902 (6th Cir. 1998).  "When an officer uses *deadly*

force, that force is unreasonable unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Puskas*, 56 F.4th at 1095 (quoting *Palma v. Johns*, 27 F.4th 419, 432 (6th Cir. 2022)). This "threat of serious bodily harm" must also be "imminent." *Palma*, 27 F.4th at 432. Factors that weigh on "whether an officer reasonably believed that a person posed an imminent threat of serious bodily harm" include: "(1) why the officer was called to the scene; (2) whether the officer knew or reasonably believed that the person was armed; (3) whether the person verbally or physically threatened the officer or disobeyed the officer; (4) how far the officer was from the person; (5) the duration of the entire encounter; (6) whether the officer knew of any ongoing mental or physical health conditions that may have affected the person's response to the officer; and (7) whether the officer could have diffused the situation with less forceful tactics." *Palma*, 27 F.4th at 432 (internal citations omitted).

We begin with the context of Officer Reinink's actions. First, in anticipation of the potential need for emergency intervention at the demonstration, GRPD officers had received an email on April 3, 2020, "which directed personnel to ensure their body cameras are appropriately charged." Yet Officer Reinink admits that, in violation of GRPD policy, his body camera was not on during the incident. Though he asserts that his body camera was off because "the battery died," likely "early in the night," GRPD's investigation concluded that Reinink turned it off "due to a privileged conversation that he engaged in, which is permitted[,]" but failed to reactivate it. Officer Reinink also admits that he knew, based on his training, that he needed a witness to observe him loading the munition, but nevertheless failed to enlist one prior to loading and firing the Spede-Heat. Sergeant Bush, moreover, testified that he had never heard of an officer, not at GRPD nor anywhere else in the nation, mistaking a Spede-Heat canister for a Muzzle Blast. Though these violations of departmental policy do not, on their own, deprive an officer of qualified immunity, they are "relevant to the first prong of the qualified immunity analysis." *Latits v. Phillips*, 878 F.3d 541, 553 (6th Cir. 2017). On this record, a jury could find that Officer Reinink's failure to follow police department required protocol and his deployment of potentially deadly force evidences "plainly incompetent" behavior that falls outside the ambit of qualified immunity's protection, *see Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quoting *al–Kidd*, 563 U.S. at 744), rather than the type of reasonable "split-second judgment[]" under "tense,

uncertain, and rapidly evolving" conditions that supports qualified immunity, *see Graham*, 490 U.S. at 396.

With this context in mind, we assess the reasonableness of the use of deadly force, guided by the *Palma* factors.[1]  First, Officer Reinink "was called to the scene," *Palma*, 27 F.4th at 432, to deal with tumultuous crowd conditions, which included individuals throwing objects at officers.  These facts support a finding that Officer Reinink faced an imminent risk of serious physical harm.

Second, the video shows that Hart possessed a cigarette, not any weapons, an observation corroborated by testimony of both parties. *Palma* noted that "even if the person's hands are not visible—and even if he appears to be suspiciously reaching for something in his clothing—these facts would not lead a reasonable officer to believe that the person posed an immediate threat of serious harm."  27 F.4th at 434; *see also id.* (collecting authorities).  Video footage shows Hart placing his left hand in his pocket as he approached the officers, but, before Officer Reinink fired the Spede-Heat cannister at him, Hart had withdrawn his hand from the pocket, and no weapons could be seen. We cannot say that the evidence supports Officer Reinink's contention that he "reasonably believed" that Hart "posed an imminent threat of serious bodily harm."  *See id.* at 432.

The third factor is "whether [Hart] verbally or physically threatened the officer or disobeyed the officer."  *Id.*  "When a person does not act 'aggressively' towards an officer, that fact undermines the officer's claim that the person presented an immediate threat of bodily harm."  *Id.* at 434.  Hart initially approached the police line at a walking pace and stopped several feet away before Sergeant Bush stepped out of the line to pepper spray him.  When he was pepper sprayed, Hart turned away from Sergeant Bush, retreated a number of steps, and then began turning back.  At that point, he was unarmed, had not verbally or physically threatened the

---

[1]Although *Palma* was decided in 2022, with one exception, the factors identified in its deadly force analysis come from cases decided before 2020.  *See Palma*, 27 F.4th at 432.  The one exception is *Wright*, decided in June 2020, which *Palma* cites for the third factor—whether the plaintiff engaged in threatening or disobedient behavior toward the officer.  *See Palma*, 27 F.4th at 432.  *Wright*, however, relies on a 2017 case, *Smith v. City of Troy*, 874 F.3d 938 (6th Cir. 2017), for this proposition.  *See Wright*, 962 F.3d at 867–68.  *Palma*, therefore, did not create new law; it merely consolidated existing clearly established law.

officers, and had stopped advancing toward the police line. Construing the evidence in Hart's favor and focusing on the moment that Officer Reinink shot Hart with a Spede-Heat cannister, we cannot say that Hart presented an immediate threat of serious bodily harm to the officers.

The fourth factor is "how far the officer was from the person." *Palma*, 27 F.4th at 432. Although a few feet of distance may be meaningless when a firearm is involved, the distance is highly relevant when an officer fears a hand-to-hand confrontation. *Id.* at 435. Hart's unarmed status—affirmed by Hart's holding of a cigarette in his right hand and removal of his left hand, unarmed, from his pocket—might indicate a reasonable fear of "a hand-to-hand confrontation." *Id.* at 435. But critically, Officer Reinink approached Hart only after Hart had turned his back to the police line and stepped away from pepper spray. Sergeant Bush had also backed away from Hart. The facts that Hart was approximately eight to ten feet away when Officer Reinink shot him with Spede-Heat, that the officers on the scene did not observe Hart with any weapons, and that Hart's progress toward the officers had already been halted by the deployment of pepper spray weigh in favor of finding that Hart "did not pose an imminent threat of harm." *Id.* at 435-36.

Turning to the fifth consideration—the duration of the encounter, *Palma*, 27 F.4th at 432—Hart began turning around only seconds after being pepper sprayed. This "very brief moment" between Hart's turn and Officer Reinink's split-second decision to deploy Spede-Heat weighs in favor of Officer Reinink. *See Untalan v. City of Lorain*, 430 F.3d 312, 317 (6th Cir. 2005); *Graham*, 490 U.S. at 397.

Because the sixth *Palma* factor, "whether the officer knew of any ongoing mental or physical health conditions that may have affected the person's response to the officer," *Palma*, 27 F.4th at 432, is not at issue, we need not address it.

As to the final factor, "whether the officer could have diffused the situation with less forceful tactics," *Palma*, 27 F.4th at 432, Officer Reinink's testified that he intended to deploy Muzzle Blast, "a powder dispersion round" suitable for "crowd control management" at "intermediate and close deployment," not Spede-Heat. This indicates that less forceful tactics were available and, accordingly, that Officer Reinink did not face an imminent threat of harm.

All the facts, viewed at this stage in the light most favorable to Hart, demonstrate that Officer Reinink faced a split-second decision during a potentially dangerous demonstration-turned-riot. But "[t]he fact that a situation 'unfolds quickly' is not . . . sufficient to justify the application of deadly force," *Palma*, 27 F.4th at 432, when it is not accompanied by a credible threat to the safety of an officer or the public. *Id.* In the moments before Officer Reinink deployed deadly force, Hart did not present such a threat. And the tumultuous scene is the only other factor weighing in Officer Reinink's favor. As a result, "a reasonable jury could find that [Officer Reinink] used excessive force" when he fired Spede-Heat at Hart at point-blank range. *See Palma*, 27 F.4th at 432.

Turning to the "clearly established" prong, we consider "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Baynes*, 799 F.3d at 610 (quoting *Saucier*, 533 U.S. at 202). "It has been well settled law for a generation that, under the Fourth Amendment, '[w]here a suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Walker*, 649 F.3d at 503 (quoting *Garner*, 471 U.S. at 11). The question in this case is whether Officer Reinink could reasonably conclude that Hart posed a serious danger to those on the scene.

Hart's conduct resembles that in *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005). There, we determined that the officer's use of deadly force "was constitutionally impermissible" where the suspect's "movement was . . . limited and he could not quickly charge the officers," "[h]e was not verbally threatening," and "[h]is hands were visible and empty." *Id.* at 697. Similarly, here, the video footage reflects that Hart's movement was impaired due to Officer Bush's deployment of pepper spray. Officer Johnson provided deposition testimony that Hart "turned his body away from us after being hit with the chemical spray, and then he turned back towards us," but "did not make an advance" on the officer line. Hart did not make verbal threats or approach the officers aggressively after Sergeant Bush sprayed him. And, as reflected in the video, Hart was visibly unarmed. On this record, no reasonable officer could have thought he had probable cause to use deadly force against Hart.

Our precedent makes clear that officers have fair warning that they may not use deadly force "[w]here the suspect poses no immediate threat to the officer and no threat to others [in the area]," *Smith v. Cupp*, 430 F.3d 766, 775–76 (6th Cir. 2005) (quoting *Garner*, 471 U.S. at 11), and we have affirmed the denial of qualified immunity where video footage "d[id] not conclusively show whether that was the case." *Lewis v. Charters Twp. of Flint*, 660 F. App'x 339, 347 (6th Cir. 2016). Given that a suspect resisting arrest and fleeing the crime scene does not justify deadly force, Hart's lesser disobedience—turning back around to face the officer line—could not warrant deadly force.

As Plaintiffs point out, our precedent also makes clear that "[t]he use of less-than-deadly force in the context of a riot against an individual displaying no aggression is not reasonable." *Ciminillo*, 434 F.3d at 468. Though inapposite with regard to Sergeant Bush's response to Hart's initial approach, *Ciminillo* becomes far more applicable to Officer Reinick's actions in the moments immediately after Hart was pepper sprayed. Again, Hart was visibly unarmed and had retreated several steps from where Sergeant Bush pepper sprayed him when Officer Reinick left the police line to confront Hart. And Hart was in the process of turning back to look at the police line when Officer Reinick launched the cannister of Spede-Heat at him at point blank range. In that moment, Hart's hands were at his sides, he was leaning on his back foot, and he was not advancing from his point of retreat. Viewing the facts in the light most favorable to Hart and drawing all reasonable inferences in his favor, as we must, *Scott*, 550 U.S. at 378 (quoting *Diebold, Inc.*, 369 U.S. at 655), Hart no longer presented the aggressive behavior that he had demonstrated moments earlier when he was advancing toward the police line.

"Precedent involving similar facts can help move a case beyond the otherwise 'hazy border[] between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Kisela v. Hughes*, 584 U.S. 100, 104–05 (2018) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 18 (2015) (per curiam)). *Ciminillo* demonstrates that, to the extent any "hazy border" existed in this context at the time, it obscured whether officers may use some degree of nonlethal force. That an officer may not use deadly force against a person displaying no aggression, even during a riot, was and remains squarely "beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

The dissent quibbles over facts that it suggests separate *Ciminillo* from the case at hand—that Hart's hands were not raised like Ciminillo's were, that Hart approached the police line despite officers' dispersal orders, and that Hart turned back toward the officers after he was pepper sprayed. But Ciminillo also approached the police officer after "officers ordered the crowd to disperse via megaphones." *Ciminillo*, 434 F.3d at 463. And, although the dissent has identified two other purported differences, it fails to explain how either might be material. An unarmed man is not displaying "aggressive behavior" by keeping his arms at his sides or by turning around in place. Thus, these differences do not diminish the principle regarding reasonable force against a person not demonstrating aggressive behavior during a riot that we clearly established in *Ciminillo*. *See Rivas-Villegas*, 595 U.S. at 5, 7 (requiring "similar facts" but not cases that are "directly on point").

Taken together, under our precedent, it was clearly established in May 2020 that the deployment of deadly force against an unarmed individual who posed no imminent threat to officers, such as Hart, was constitutionally impermissible. We therefore reverse the grant of summary judgment in favor of Officer Reinink.

**B. Claims Against the City**

Recognizing that "there can be no doubt that § 1 of the Civil Rights Act was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights," the Supreme Court has long held that a municipality can be sued under § 1983 for constitutional violations for which "the government as an entity is responsible." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 700–01 (1978). The preliminary question in a *Monell* analysis is "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "Municipal liability for the actions of employees may not be based on a theory of respondeat superior." *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994) (emphasis omitted).

Our precedent provides at least "four methods" to prove a municipality's illegal policy or custom—the plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the

existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Wright*, 962 F.3d at 880 (quoting *Jackson v. City of Cleveland*, 925 F.3d 793, 838 (6th Cir. 2019)). "[T]he dismissal of a claim against an officer asserting qualified immunity in no way logically entails that the plaintiff suffered no constitutional deprivation, nor, correspondingly, that a municipality . . . may not be liable for that deprivation." *Doe v. Sullivan County*, 956 F.2d 545, 554 (6th Cir. 1992).

Both before the district court and on appeal, Hart and Guzman connect their record evidence to the theory that the City ratified the officers' unconstitutional conduct by insufficiently investigating and punishing that conduct. *See Pineda v. Hamilton County*, 977 F.3d 483, 494–95 (6th Cir. 2020).[2] To establish *Monell* liability for ratification based on a failure to investigate, a plaintiff needs to show "'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances." *Pineda*, 977 F.3d at 495 (quoting *David v. City of Bellevue*, 706 F. App'x 847, 853 (6th Cir. 2017)). This requires the plaintiff to present evidence of "multiple earlier inadequate investigations . . . concern[ing] comparable claims." *Id.* (quoting *Stewart v. City of Memphis*, 788 F. App'x 341, 344 (6th Cir. 2019)). "[A]n allegation of a single failure to investigate a single plaintiff's claim" fails to satisfy this standard. *Id.* (emphasis omitted). In contrast, the testimony of several witnesses to persistent patterns of failure to correct excessive force and/or details of past instances of excessive force can sustain *Monell* claims based on a ratification theory. *See Berry*, 25 F.3d at 1355 (discussing cases).

Hart and Guzman present a spreadsheet listing every reported excessive force claim against GRPD officers between 2015 and 2020, which they submit demonstrates that "every single officer in nearly 90 complaints for excessive force over a five-year span was exonerated or

---

[2]Elsewhere in their briefing, Hart and Guzman discuss the legal standard for a different form of *Monell* liability—failure to train. Hart and Guzman likewise alluded to that claim in their complaint. A plaintiff can waive a potential appellate argument by failing to first argue it to the district court. *See Laake v.Benefits Comm., W. & S. Fin. Grp. Co. Flexible Benefits Plan*, 68 F.4th 984, 995 (6th Cir. 2023). And a plaintiff can forfeit an argument on appeal by failing to adequately develop it though argumentation. *See Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 843 (6th Cir. 2024), *cert. denied*, No. 23-1238, 2024 WL 3089575 (U.S. June 24, 2024). Hart and Guzman did not brief the failure to train claim to the district court, and their appellate briefing does not connect this theory to any record evidence. In light of precedent and this record, Hart and Guzman abandoned any failure-to-train claims, so we confine our *Monell* analysis to the preserved ratification claim.

cleared by the department." Only two claims were sustained. This, coupled with the GRPD imposing only two days of unpaid leave on Officer Reinink for the sustained charge of unreasonable force, Hart and Guzman argue, evidences the City's deliberate indifference to officers' deployment of unconstitutionally excessive force. The City responds that, absent additional context, "the raw number of excessive force complaints" renders Hart's and Guzman's arguments purely speculative, and thus, insufficient to proceed to trial.

The spreadsheet contains seven columns of information, and all but two columns identify the complaint and the subject officer. Those two columns, labeled "Allegation" and "Finding," offer little in the way of substance. Every row of the "Allegation" column reads, "Unreasonable Force." The "Finding" column contains the result of GRPD's investigation—indicating only that the claim was sustained, not sustained, withdrawn, or unfounded, or that the subject officer was exonerated. Accordingly, the spreadsheet lacks any substantive description of the events giving rise to the complaint or of any specifics of GRPD's investigation or its results.

Without some qualitative specifics, the district court lacked a basis under our precedent to conclude that genuine disputes of material fact regarding Hart's and Guzman's single ratification claim remain. Some information or evidence indicating that GRPD failed to properly investigate the unreasonable force complaints it received or that dismissed complaints were well-founded could have provided the requisite foothold. *Pineda*, 977 F.3d at 495–96; s*ee also Wright*, 962 F.3d at 882 (reserving the grant of summary judgment based on testimony that the sergeant "had *never* heard of a use of force incident by a[n] . . . officer that seemed inappropriate to him"). But Hart and Guzman did not adduce information or evidence indicating a pattern supporting their claim of ratification based on a failure to investigate past unreasonable force complaints. Thus, the district court's grant of the City's motion for summary judgment on Hart's and Guzman's municipal liability claims is supported by governing law.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the grants of summary judgment to Officer Johnson, Sergeant Bush, and the City, **REVERSE** the grant of summary judgment in favor of Officer Reinink, and **REMAND** for further proceedings consistent with this opinion.

———————————————

**CONCURRENCE / DISSENT**

———————————————

LARSEN, Circuit Judge, concurring in part and dissenting in part.  I concur in the majority opinion to the extent that it affirms the district court's grant of qualified immunity to Officer Johnson and Sergeant Bush and the grant of summary judgment to the City. I respectfully disagree, however, with the majority opinion's analysis of Officer Reinink's liability.  Because Hart has failed to meet his burden of establishing that Officer Reinink violated his clearly established rights, I would affirm the district court's grant of qualified immunity to Officer Reinink.

Two long-established qualified immunity principles compel this result.  To overcome an officer's qualified immunity defense, "[t]he plaintiff bears the burden of showing that the right was clearly established." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022).  That is, the "plaintiff must point to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Id.*; *see also Mosier v. Evans*, 90 F.4th 541, 547 (6th Cir. 2024) (The plaintiff bears the "burden of identifying a case that should have put [the officer] on notice that his specific conduct was unlawful." (citation omitted)).

That principle dovetails with the second—specificity.  "[W]hen it comes to excessive force, the Court has repeatedly told us that specific cases are especially important." *Bell*, 37 F.4th at 367 (citation omitted).  That's because "excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)). So while Supreme Court "caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 104.

Hart stumbles from the start. In his briefing, Hart offers just a single case to show that Officer Reinink violated his clearly established constitutional rights—*Ciminillo v. Streicher*, 434 F.3d 461 (6th Cir. 2006). *Ciminillo*, however, is not a lethal force case. Hart's lone argument is that *Ciminillo* shows that no amount of force whatsoever could be justified in these circumstances; *a fortiori*, lethal force was inappropriate here. But *Ciminillo* is, as even the majority opinion recognizes, distinguishable from the circumstances of this case.

Hart says *Ciminillo* shows that an officer's use of less-than-lethal force was excessive when a plaintiff "slowly walked toward an officer in a non-threatening manner during a riot." Appellant Br. at 23. Maybe so, but that isn't this case. It is true that *Ciminillo* shares some features of the instant case. The use of force in *Ciminillo* occurred within the setting of a riot while the police broadcasted dispersal orders over the unrest. *Ciminillo*, 434 F.3d at 463. But the record in *Ciminillo* also reveals critical differences in the plaintiff's behavior that significantly distinguish Hart's actions in the instant case.

Ciminillo approached the police with *both of his hands held above his head in the surrender position*. *Id.* He was attempting to comply with their dispersal order by peacefully leaving the scene of the riot, having been turned away from his first attempted exit path by a bat-wielding occupant of a neighboring home. *Id.* The court concluded that no reasonable police officer would believe that a person in this posture presented a serious threat. *Id.* at 468.

In contrast, Hart was not attempting to peacefully leave the scene. Quite the opposite. As the district court explained, "[T]he record is undisputed that Hart, despite multiple orders to leave, returned to the scene, exited his car and advanced toward the officers." R. 132 Opn. & Order, PageID 1563. The situation was tense as Hart approached the officers—given that he walked to the "line of officers with his hand in his pocket." *Id.* His hands were not raised in a surrender position that "demonstrated that he was not armed, and thus posed no threat to the officers' safety." *Ciminillo*, 434 F.3d at 467. Eventually, Hart exposed both of his hands while pointing one at the police officers. It was then that Sergeant Bush sprayed Hart with pepper spray. Hart, however, "was undisputedly not deterred by Sergeant Bush's use of pepper spray." R. 132 Opn. & Order, PageID 1563. Rather than retreat, Hart "lifted his head, took a drag on his cigarette, and turned back again toward the police line." *Id.* In his own testimony, Hart

explained "that he 'turned back' because he was 'mad.'" *Id.* at 1539 (quoting Hart. Dep., Ex. M at 256).

This court in *Ciminillo* determined that no force was warranted because Ciminillo "posed no risk" to the safety of officers, largely due to the fact that Ciminillo held his hands in the surrender positions. *Ciminillo*, 434 F.3d at 467–68; *see also Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) ("By raising his hands in the surrender position, [the plaintiff] arguably showed that he was unarmed, was compliant, and was not a significant threat to [the officer's] safety."). The facts aren't the same here. The fact that both of Hart's hands were visible in the seconds directly before Officer Reinink's use of force does not bring the instant case within the scope of *Ciminillo*. Hart's hands were never in the surrender position; he was unwilling to comply with the officers' directives (including one from Officer Reinink to leave and get back); and he turned back toward the officers, "mad" and undeterred by non-lethal force. So, *Ciminillo* does not place the conclusion that a reasonable officer would perceive Hart as nonthreatening beyond debate.

The majority opinion offers two cases of its own—*Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005), and *Lewis v. Charters Township of Flint*, 660 F. App'x 339, 357 (6th Cir. 2016). *Sample* is factually distinguishable and not sufficiently on point to create a clearly established right. *See Bell*, 37 F.4th at 368. Among many distinguishing factors, the police in *Sample* found the defendant in a cabinet, meaning that "[h]is movement was therefore limited and he could not quickly charge the officers." *Sample*, 409 F.3d at 697. Here, however, Hart was roughly eight to ten feet away from the officers and presumably could charge at any moment, especially given that the pepper spray appeared to have little effect on him. As for *Lewis*, it is also factually distinguishable. Hart was not "a fleeing suspect," *Lewis*, 660 F. App'x at 347, rather he was advancing seconds before he was pepper sprayed, and undeterred, had turned back toward the officers again. Moreover, the majority opinion doesn't tie the facts of *Lewis* to this case but instead relies on *Lewis* in support of the general proposition that "officers have fair warning that they may not use deadly force '[w]here the suspect poses no immediate threat to the officer and no threat to others [in the area].'" Maj. Op. at 16 (alterations in the original) (quoting *Smith v. Cupp*, 430 F.3d 776, 775–76 (6th Cir. 2005)). Such general rules don't suffice in this context,

and in any event, *Lewis* is an unpublished opinion and cannot create clearly established law. *Bell*, 37 F.4th at 368.  Finally, it is Hart's burden to come forward with a case, not this court's. *Id.* at 367.  I would affirm the district court's grant of qualified immunity to Officer Reinink.

For these reasons, I respectfully dissent in part.